here. First, from Mr. Davenport, you may proceed when you're ready. Thank you. Good morning, Your Honors. May it please the Court. Scott Davenport for the appellants. I would like to reserve three minutes of my time for rebuttal. Your Honors, this is a case where four individuals were robbed at gunpoint. An in-progress assault with a deadly weapon was called in and officers responded to the one minute. At the time they did, they observed the appellants. They handcuffed them and they placed them into the back of their patrol car. They then turned their attention to the quickly assembling group of onlookers who began to shout at the deputies. After establishing control of the scene and investigating, the officers determined that the appellants were not the suspects of the Okay. Counsel, so I tried to do a timeline and at some point we sort of lose track of things. It's very difficult to tell. So can you sort of walk me through at what point in this process the boys were handcuffed and placed in the back of the police car and how long it was before they were released from the police car? Let me put it to you this way, Your Honor. The question of how long they were in the back is in dispute. Okay. And so we have to accept their version of the facts. Right. I understand that. I appreciate you're acknowledging that. So let's work with their numbers. So tell me how long at the longest then, at what time approximately they are handcuffed and put in the car and what time are they released? They indicate that they are in custody for 25 minutes. Okay. And that would be a roughly from what time? Do you have that time? I don't have that in front of me, Your Honor. Okay. That could be about, it looks like from dispatch that would be about 746 and you think that it's 25 minutes. It's not entirely consistent with the other officer's testimony, with the CAD readouts. Right. It's not, that's not too far from what the others said. Now, during those 25 minutes, they already knew at that point, according to dispatch, it appears that the car has already been cleared. So they don't have the vehicle. There's no white car. It didn't drive itself away. So if, and they've only been told by dispatch of a black adult male. So you don't know whether there's multiple people in the car, but at least one person who had to be in the car is probably still in the car because the car is not present. So at that point, what, why does it take 25 minutes to clear these boys? Honestly, well, again, assuming their numbers of 25 minutes, there was the crowd, there was this burgeoning crowd that they had to deal with. You know. They have five to six officers and Tapali is the one who's going to do all the interrogating. I'm sorry, can you say that again? Well, they've got five to six officers on the scene and Tapali is the one officer who's going to talk to all the boys. Does it take him 25 minutes to interrogate all three boys? Those are the numbers that we're using, Your Honor. Okay. I'm stuck with the numbers. Can you explain why it takes that long? At least one of the boys was not cooperative. That's true. They had to deal with individual at the scene. They were all- Yes, but Tapali doesn't. You have five to six officers on the scene and Tapali is the one who's conducting the interviews. Why does it take Tapali 25 minutes to talk to the three boys who clearly are not adult black males? Well, I think they're determining what happened with everybody's different points of view. There is testimony that both the boys and various other people at the scene indicated that these were not the victims. That information had to be confirmed. You know, it's not unusual that police will arrive, they'll take someone into custody, and let individuals say they were not involved. So the fact that other people at the scene said, these are the people you're looking for- As I understand it, under their version of facts, which we have to take as true, there is a lag between when they claim the officers should have known that objective cause to hold them had dissipated, and when they were actually physically released, which under their view of it, creates an unlawful detention. What's your response to that? I think that it's within the timeframe of being reasonable under the totality, and to the extent it's not, they're entitled to qualified immunity, if there's a mistaken fact as to how long it took to clear. What I would like to... You seem befuddled. Do you want me to expand on that? No, I'm finding your argument after you've answered my question. What I would like to concentrate on, though, is the race-based aspect of this, and the equal protection claim. And in this case, after the officers moved for summary judgment, the appellants asked the court to take judicial notice of the fact that African-Americans were treated differently than other races by the LA Sheriff's Department. The fact that they said it was not reasonably in dispute. This was based on a couple of articles. It's clearly a flawed a ruling that has infected this entire case. The law is clear that the court could take- On a qualified immunity appeal, we can only do questions of law. We can't do issues of fact. So even if we were to conclude that the district court improperly applied the rules of evidence in assessing what the district court could look at, the question would remain whether construing facts in the light most favorable to the plaintiffs. There was what everyone should have recognized was an illegal detention for some period of time before they were released. The issue of equal protection is separate and apart from the detention issue. There's a force issue, there's a detention issue, and there's this equal protection claim that they were treated differently because of their race. And that's the most problematic aspect of this case, in our opinion, and it's something that taints it all the way through. So in your view, if the evidentiary ruling is set aside, then the equal protection aspect of the district court's ruling collapses and that qualified immunity would attach to this? Well, there's no other evidence of any equal protection violation other than what the court took judicial notice of. And this is in the excerpt of record at 1ER18, the judge based the denial of the MSJ on the equal protection grounds on this traditionally noticeable information. Counsel, I have less concern about the equal protection part of this than I do about just the Fourth Amendment question about whether this is a reasonable esoteric stop. So let me take you back to at page 507 of the excerpts of record. There's a very, very confusing document that is a huge listing of a bunch of code, and it's very difficult to tell what this means. But about two-thirds of the way down the page, one of the entries says, pointing a gun at informant, pointing a gun at an informant, DP, which I think is detained person, ran. Okay, so this is obviously something from dispatch or some kind of communication between the officers and dispatch because the pointing a gun is what dispatch told them based on Herrera's conversation with the 911. The next entry says, vehicle over male juvenile. Was that information communicated to the officers on the scene? Herrera tells dispatch, we've got the, we have Herrera tells dispatch, dispatch says, how old was he? I don't know, 17. Yeah, he's been hit by a car. Okay, we've got a male juvenile, maybe about 17, who's been hit by the car. Okay, so this is obviously a victim, not one of the perpetrators. And in this entry, it says vehicle over male juvie. I just can't tell. That's not on the transcript of the dispatch. Was this in some other way communicated to those officers? As I stand here today, I don't know the answer to that. And I apologize for that, Your Honor. I just, I don't know. I wasn't anticipating that aspect of it. While I'm quickly running out of time, I would like to briefly discuss the issue of the use of force in terms of the pointing of the weapons. As it turns out, these individuals were not the suspects, they were the victims, but that doesn't mean the response was unreasonable under the totality of the circumstances. If we had a call from the marshals out there, that men were trying to get into the building, and they had a gun, and within one minute, backup showed up, and they had their guns drawn, and they were pointing at people, it turned out that they were innocent. That doesn't mean that the response is an excessive force violation. It turns out that it might have been wrong, that might still be reasonable under the totality of the circumstances, and certainly the officers would be entitled to qualified immunity. That's what we have here. Now there's, they do have a handcuffing claim from Bogan, and in that one, they say that the cuffs were too tight on several of them. Bogan is the only one I believe that they say he asked to have them loosened, and they weren't loosened. There's nothing I can do about that. I can't get around that, just like I can't get around the 30 minutes. That's his claim. We're stuck with that. But everything else, up until then, there's no basis for an excessive force claim, and I would admit to you that the detention issue is a little more thorny, but that doesn't mean that they're not entitled to qualified immunity. You know, this is not a state law tort claim. This is an intentional civil rights claim, and they have to have that signer, and qualified immunity applies unless the conduct was clearly, there was intent to clearly violate the law, or the officers were just patently unreasonable, and there's nothing to suggest either one of those in this case. This is a textbook example of a qualified immunity case. I'm at a perfect transition spot, so let me preserve the balance of my time, and I will yield to opposing counsel here real quick. All right. Thank you, counsel. We'll hear now from Mr. Morrison. Good morning, your honors, and please, the court. I could walk through this timeline, because I think it's an important thing for the court to understand. What happened is that 737, a broadcast goes out that a black male in a white sedan is pointing a gun at an informant. Mata and Ochoa receive that. They get permission for a code three lights and sirens, and in one minute, they arrive at the scene. At 739, another broadcast is made. That broadcast advises that a juvenile has been run over by the vehicle. And, okay, I did not see that on the transcript. I cited the page to opposing counsel, which is page 507, but this is nearly incomprehensible. I mean, it's just a bunch of code with a very, very brief thing that says VEH, which is vehicle, over M slash juve, so I assume that's male juvenile. But I can't tell whether this was communicated, and it's not in the transcripts of dispatch's communications. I have an additional site, which is also 343, which may be one of the deputies explaining what it means, but I don't know that offhand. What I can tell you is I had that code deciphered by the various deputies, and that's what it means. That's the time that it took place at 739, right? At least one of the on-scene testified that it was their job to monitor the radio for MDD dispatch. Okay, but if they are not communicated this, yeah, so they've got a duty to monitor, but do we know that they heard that anybody heard this? Ochoa and Mata deny hearing it, right? But I want to also make an important point about what happened en route. En route, Ochoa and Mata made a decision based on the nature of the stop and that everyone on scene had to be detained. It's a big part of our Monell case, but it also bleeds into the Fourth Amendment analysis. That is, they weren't confronted with the circumstances in front of them, but they had made a pre-decision to handcuff everybody. And how do I know that? The 911 caller was handcuffed. A person the officers conceded knew was the 911 caller was placed in handcuffs in the vehicle with one of the juveniles, which by the way is a violation of policy in and of itself. You don't put adults in a car with juveniles. Yeah, but we're here on a Fourth Amendment question, not on a policy question. All right, so they get there. They've got Herrera, who is on the phone. The officers testify. They usually assume this is the victim because they usually assume that they're on the phone with 911. Out of an abundance of caution, because there is a gun in the area, they decide that they're going to handcuff him until they can figure this out. They're asked in deposition, yeah, the guy's Hispanic. He's not a black male. And they said, sometimes there are questions with persons of color. We have black Hispanics. So as Mr. Herrera so articulately put it, there was a lot of chaotics going on. Sure. But let's look at the evidence that the usage justified this detention in the first place. One is the white sedan. Between 738 and 743, the white sedan is cleared. Next, they claim that Herrera was descending the stairs with the phone in his hand, pointing nervously upward. Herrera denies that. The 911 call refutes it. He clearly is at the top of the stairs. When deputies come, he says, should I come down? Topoli, who investigated this, said Ochoa and Mata never told him that a frightened Herrera descended the stairs and pointed upwards. Was Herrera put in handcuffs in the back of the car after the white van was cleared? Yes. During the call down. So what happens is, is between 743 and 749, each of the plaintiffs are called down, including Herrera. Does the record show whether the officers on the scene were aware that the white sedan had been cleared? Yes. Came back clear and current. Was broadcast, right? Not connected. It was dropping back to a Herrera, to the owner of Barts. And at what time were the handcuffs taken off and everyone was released from custody? 25 minutes after 749. So whatever that adds up to, right? Because 749 is when the handcuffing takes place. They're placed on the back of a patrol vehicle. 29? 749. 49. Yeah. That's when they report that the situation is stable. Code four, a very telling statement which refutes this claim about a boisterous crowd interfering. You don't call a code four if the scene is not secure. Code four means scene is safe and secure. And look what, by 749, let me just run through this. They've been searched. There's not five to six officers. There's 10 to 15. In fact, the testimony in the record, I think it was Mata who said, it was like the whole department showed up. They had done a protective sweep of the area already. There was nothing at this point connecting these 14 year olds. Okay. All right. So counsel, I think I understand. I mean, the problem is you've got the cars cleared. It didn't drive itself off. We don't have anybody else identified in the car. Although Herrera has told dispatch he thought he saw someone maybe in the back seat reaching into his back pocket and it might have been a gun. This is what gets reported as holding a gun. They're held for 25 minutes. If I add all of this up correctly, that looks like they were held between 749 and 814 by my calculations. Okay. A long time to hold three kids, one of whom is five foot two, according to his, one's five foot six and one's five foot eight, and they're 14 years old. All right. What's your best case that the officers have exceeded any of the reasonableness of a Terry stop? And my concern is that the Terry stop here has clearly been elongated by the conduct of the parents. It's not just that they're disruptive is that at least one of them has told the boys not to talk to the police. And if they're not cooperating, what are the police supposed to do? So give me your best case that would tell us there is no qualified immunity here. Sure. For the unlawful detention, United States versus Ortiz Henderson, right? That's a case where they assume there was reasonable suspicion to detain the suspect. It's a case where individuals indicated the suspect could maybe swallow drugs. It's a case where the defendant lied about his age and someone had ID'd him as selling drugs in the past. But at the point he is strip searched in the coffee shop and no drugs are revealed, they said it was unreasonable afterwards to handcuff and essentially arrest them. And this was an arrest. United States versus Brown, which is a decision I believe by Mr. Justice Collins. In that case, it was determined that when a Terry stop exceeds the scope of the reason for the detention in the first place, it is no longer lawful. The detention is based on searching for a weapon. These boys were searched for weapons, a protective suite. I think the line between a Terry stop and arrest is whether a reasonable person would believe that the detention was indefinite and was not going to terminate. And was there any basis to believe that they were actually going to go to the station house so that this was indefinite? So if you look at United States versus Chamberlain, United States versus Ricardo, there's clear case law that 25 minute detention on the back of patrol car in handcuff constitutes an arrest. In Ricardo D, it was a compliant juvenile was put in the back of the car in handcuffs. And the Ninth Circuit in nearly identical factual situations now twice has indicated that that was unlawful. And I also want to point out in United States versus Brown, you had a compliant detainee, you had officers who outnumbered the individuals, and they were searched with nothing being found connecting them to a crime. And that was determined to be an unreasonable Terry stop. So this was converted into an arrest. At the moment they're handcuffed, they have no basis for that. They have no basis to believe that they had anything to do with the 245. They have parents on scene who are screaming, these are the victims, but 911. Yeah, but they don't have to take the word of the parents. The parents weren't witnesses. They're bystanders. The most interesting person here, who I don't have any records, I couldn't find any records in the ER, is Herrera's wife or his girlfriend. Did she get deposed? No. So we have had trouble locating her. We have recently found her. But the answer is, Herrera testified that she said this, that she actually walked down the stairs, told the deputies, you have the wrong people. And the way it was described by Herrera is that she was like physically moved off to the side. So they're ignoring the 911 callers. And by the way, I do think the parents are witnesses because the kids called their parents. That's why they arrived on scene. Yeah, but this is hearsay. The parents were not witnesses to what happened or where their kids were. But again, it's the totality of circumstances. So the car's been cleared, the boys have been searched, there's nothing. Well, those are relevant. The parents' testimony seems to me to be irrelevant. Understood. I'm just trying to point out all the different ways that these officers have information in front of them that these individuals were innocent. So when do you think the officers should have released them? At what point in the chronology? I think there's no question by the point where they brought them down the stairs, searched them, searched their belongings, did a protective sweep and had nothing connected to the crime, that they should not have handcuffed them and put them in the back of the patrol car for further questioning. And by the way- You don't think they were entitled to question them? I don't. At all? Not in handcuffs, not in the back of that car. I don't. They could question them, but they couldn't be restrained? Because there's no connection to the crime, I think they have to be released. And it's up to the boys at that point, whether or not they want to discuss anything with the officers or not. Our Fourth Amendment jurisprudence allows individuals who don't want to talk to the police that haven't done anything wrong to have that choice. But that choice was taken from them. And again here, there's just a mountain of evidence before they're handcuffed that shows that they're not part of this. And we also have to keep in mind that these are kids. Every minute in the back of patrol car matters. And they were actually held five to ten minutes when the officer subjectively stated that they knew they weren't the 245 suspects. And I asked them why they did that. One said it was part of my training. The other said it was human error. I don't know of any case law when you subjectively believe someone is not the suspect you're looking for that you can keep them in handcuffs five to ten minutes. And at that point, they knew they were a 14-year-old kid. So the 25 minutes is, again, giving all deference to your evidence. If we've got 25 minutes, is Topoli talking to them for all 25 minutes? He's going between the cars is what he did, which elongates the process, right? You didn't have anyone help him do it. Well, there are good reasons for wanting a single officer to hear what the boys are saying to see whether they're contradicting each other. It's fine. But again, at this point, why are they in handcuffs? Why are they in the back of patrol cars? There's nothing connecting them to the underlying crime. They've searched the area. There's no weapons. So do you have any idea how long Topoli was interviewing? Is there a time when Topoli interviewed them over the first 10 minutes of the last 15 minutes? They're just sitting in the cars? So even though Topoli's doing the interview, apparently other officers who were in the patrol cars were asking questions. And the testimony from one of the plaintiffs is one of the women asked them, one of the deputies, female deputies, asked him a question and kind of made a comment like, you're just a kid. You're just a boy, right? So there's other people around that are in these patrol cars that appear to be questioning them. Topoli's the lead investigator, and so he is the one that is going between the cars and ultimately makes the decision when to release them. But again, the deputies admitted they were kept in detention. Five to 10 minutes after subjectively it was agreed among everyone, they were the victim. Does the record show about when Herrera was released? It does not. And I don't know that, but again, he was in the car with one of the boys, which is just a very curious decision. And what does the record show about the justification given for putting him in handcuffs? Just they wanted to control the situation and investigate until they found out exactly what happened. But again, that decision was made before they arrived on scene. And the testimony from Ochoa and Mata is very clear. That's our train. The LA sheriffs have a policy and a T-stop felony, according to them, and we're going to make a big deal as a Monell case, that you need to handcuff everyone in a scene like that until you figure out what happens. How is that? I see how that's relevant to the Monell claim. How do you think it's relevant to the claims here? It just shows that they're not waiting for the circumstances in front of them to guide their actions. They had a predetermined plan and they never deviated from it despite the evidence of innocence they're receiving. And United States versus Ortiz-Henderson versus United States and Nicholson versus City of LA say officers cannot ignore exculpatory evidence. When probable cause and regional suspicion dissipates, you must immediately release someone and at the very least not arrest them. And there was an arrest here, according to Chamberlain and Ricardo D. I want to briefly just address the equal protection claim. We don't need the statistics to prevail on our equal protection claim, but the court didn't take judicial notice of the fact that these boys were discriminated against. It took judicial notice of statistics, which plaintiffs argues raises a genuine issue of material fact. But do you think it's a correct application of Federal Rule of Evidence 201 to declare that the particular academic organization that published the Journal of Personality and Social Psychology is one whose accuracy cannot reasonably be questioned? Is that consistent with what we've said about the scope of Rule 201? I do believe it is. It is an academic peer-reviewed study. And in the past, courts have taken judicial notice of that. But I think your question goes to the weight of the evidence as opposed to sufficiency to raise the issue of material fact. But with respect to that study, that's really more relevant to our Monell claim. It's the government statistics showing disproportionate stops of African-Americans that was more relied upon in terms of making the argument that there was an issue here. But again, you don't need it. There's plenty of other information here, right? These cases are like Title VII cases. So things like pretext, deviation from standard policies, spoliation, all of which were present here, can also show discrimination, right? We think two of the reasons for stopping these boys were fabricated, right? Herrera descending the stairs, one of the boys ducking out of view. Those appear to be pretext. A complaint was made the next day. It was never investigated. There was a ring camera of the incident. It was captured. And they didn't preserve it. These are all things pointing to discrimination that in a typical employment case, we would say, yeah, that gets you over the burden. And again, all right. Thank you, counsel. You've gone over your time. All right. We'll hear rebuttal now. Thank you, Your Honor. I'm not going to belabor the equal protection argument in light of the tenor of the court's questioning. Also, we have not really spent any time on the force issue. And so I won't be addressing that either. What we're left with, I guess, in this case is an issue of the detention. And if this court. Do you have a good case that tells us that that this was these officers should not have known that they're violating the Fourth Amendment? I do not have that. It's got to be clearly established law. There was a reference. I mean, counsel said that among the facts we have to take as true is that at least some of the officers reached the subjective conclusion that the boys were not involved. And yet the detention continued. Do you agree that for purposes of this proceeding, we have to take that fact as true? I. Yes, I think you do. I mean, wouldn't every reasonable police officer know that you cannot continue to detain someone whom you know and have determined is there is not reasonable suspicion to detain? Well, I think there's a difference between knowing and still conducting your investigation. And that's that's the fact that it's convenient to investigation to keep people in handcuffs is not a basis for keeping them in handcuffs if you don't have reasonable suspicion. And no, you don't have reasonable suspicion to continue the detention. Well, I think there's there's a difference between knowing you don't have reasonable suspicion and believing that these might be the probable victims and believing that they might be the probable victims. They get to hold them in handcuffs until they determine that they're victims. I thought they had to hold them so long as they had suspicion that they were involved, that they were that they were the perpetrators, not the victims. I think at this point, what Judge Collins was referring to is they had this subjective belief that these were not the suspects. And then they hold them for five to 10 minutes longer. Why isn't that a violation of a Terry stop? I think at that time, they're still trying to suss out what happened. They might have had this belief. I know, but at that point, they get released while you're still trying to figure out what happens. There is no convenience detention. The Terry stop is tied to reasonable suspicion. And once you know the reasonable suspicion is no longer there, it ends. Understood. Understood. All right. So, look, they've got to show some kind of a case to demonstrate that the officers reasonably should have known, clearly should have known that this was wrong. Do you have anything that in which we have granted or any other court has granted qualified immunity under circumstances that were similar to this? Not to this. I think this one's a little bit unique. And in the absence of that factually specific case under White versus Pauly, unless there's that similar situation, they are entitled to qualified immunity. I'm out of time here, Your Honors. I'm sorry. I'd love to sit up here with you all day. But with that, the appellant submit. All right. Thank you, counsel. The case just argued will be submitted.
judges: BYBEE, COLLINS, BRESS